**IN THE U.S. DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

EDIN HUSIDIC, D/B/A AMA
EXPRESS, INC., et al.,

        Plaintiffs,

v.

FR8 SOLUTIONS, INC., et al.,

        Defendants.

Case No.: 3:24-cv-00963-WWB-SJH

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

**INTRODUCTION**

This case involves a widespread scheme perpetuated by Alen Kajdic and

Azra Begovic, chief officers of the motor carrier company FR8 Solutions, Inc.

("FR8"), to defraud truck drivers out of their agreed-upon compensation. Plaintiffs

executed contracts with FR8 providing that, as compensation, they would receive

88% of the linehaul for each load they transported. In the transportation industry,

paying a truck driver based on a "percentage of the linehaul rate" means paying a

driver a percentage of the total price the carrier's third-party broker customers pay

the carrier to transport the load. Kajdic and Begovic, however, concealed and

under-reported the load price received from FR8's third-party broker customers to

underpay Plaintiffs for each load they hauled. When Plaintiffs discovered the fraud,

Kajdic made death threats to intimidate them.

1

Defendants now move to dismiss Plaintiffs' claims, Dkt. # 52 ("Motion"), but this request should be denied for several reasons. For one, Defendants ask this Court to engage in contractual interpretation that is inappropriate at the motion-to-dismiss stage. For another, even if the Court construed the contract, it clearly requires Defendants to pay Plaintiffs 88% of the load value for each shipment and to provide Plaintiffs with certain documents substantiating their payment amounts. Kajdic and Begovic, however, provided Plaintiffs with fraudulent dispatch instructions and/or statements showing underreported load values so Plaintiffs had no way of knowing they were being underpaid. Kajdic also made death threats to Plaintiffs in violation of federal and state law.

Construing all reasonable inferences in Plaintiffs' favor, Plaintiffs sufficiently allege claims for: (1) a violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO") based on the death threats and fraudulent conduct; (2) a breach of the agreement for the nondisclosure of the information and for underpayment; (3) violation of the Truth In Leasing Act ("TILA") for the failure to allow Plaintiffs to examine documents confirming the load price amounts; and (4) violation of the Florida Deceptive and Unfair Practices Trade Act ("FDUTPA") for falsifying dispatch instructions and statements and otherwise concealing and failing to fully disclose to Plaintiffs the true value of the load price amounts. As such, Defendants' Motion should be denied.

## BACKGROUND

### A.    The Parties

Plaintiffs are owner-operator truck drivers who transported loads through interstate commerce and entered into the same or substantially similar agreements with FR8 from at least January 2017 to August 2023. Dkt. # 24 ("Am. Compl.") at ¶¶ 1, 6-27, 34, 38.

Defendant FR8 is a trucking carrier that conducts interstate trucking operations throughout the United States using third-party brokers. *Id.* at ¶¶ 28, 42. Once FR8 receives a load rate confirmation from a third-party broker, FR8 sends dispatch instructions to truck drivers instructing them where to pick up and deliver the freight. *Id.* FR8 communicates with its truck drivers via mobile application transmissions, phone calls, texts, emails and mailings. *Id.* at ¶ 28.

Defendant Kajdic is the chief executive officer of FR8. *Id.* at ¶¶ 29, 88(a). Kajdic controls FR8 and participates in FR8's corporate decision-making, including but not limited to recruiting drivers, maintaining the FR8 driver fleet, managing internal operations and signing contracts on behalf of FR8. *Id.* at ¶¶ 90, 140.

Defendant Begovic is the chief financial officer and an accountant of FR8. *Id.* at ¶¶ 30, 88(b), 91. Begovic was in charge of sending out Statements of Earnings and Deductions to Plaintiffs, in addition to running the financial operations of FR8. *Id.* at ¶¶ 91, 141.

**B.    The Agreement Between Plaintiffs and FR8**

Before executing contracts with FR8, Plaintiffs received phone calls, emails and/or text messages across state lines from agents and/or representatives of FR8, including Kajdic. Kajdic represented to Plaintiffs that FR8 would pay Plaintiffs 88% of each load they hauled. *Id.* at ¶ 35. In the transportation industry, paying a truck driver based on a "percentage of the linehaul rate" means paying a driver a percentage of the total price the carrier's third-party broker customers pay the carrier to transport the load. *Id.* at ¶ 40.

In reliance on these representations, Plaintiffs executed agreements with FR8, all of which are identical or substantial similar (the "Agreement"). *Id.* at ¶¶ 37, 38, 134; Dkt. #24-1 at pp. 1-18. The Agreement requires Plaintiffs to furnish services, in addition to providing FR8 with a tractor and trailer for FR8's exclusive and continuous use. Dkt. #24-1 at pp. 3-4, §§ 2, 5. The Agreement requires FR8 to pay Plaintiffs 88% of the linehaul rate for Plaintiffs' services. *Id.* at p. 4, § 3. Plaintiffs are required to pay "gross revenue tax", and Plaintiffs authorized FR8 to deduct the "gross revenue tax" from Plaintiffs' settlements or performance bond accounts. *Id.* at p. 5, § 17 and p. 13. Plaintiffs are entitled to 88% of any stop charges that are collected. *Id.* at p. 12. "[FR8] specifically agree[d] to provide to [Plaintiffs] copies of any rated freight bill for shipments handled by [Plaintiffs] at the time of Settlement as requested by" Plaintiffs. *Id.* at p. 4, § 6. Plaintiffs would not have executed the agreements with FR8 if they knew that they were not going to be paid the full 88% of the linehaul rate. Am. Compl. at ¶ 37.

4

**C.    The Fraudulent Scheme and Operation**

Kajdic and Begovic devised or otherwise participated in a scheme to underpay Plaintiffs for the loads Plaintiffs transported through interstate commerce. Am. Compl. at ¶ 2. Kajdic and Begovic did so by concealing and misrepresenting load price amounts to Plaintiffs and directing FR8 employees or agents to do the same. *Id.* at ¶ 90. At Kajdic's direction, FR8's employees and/or agents used interstate wires and mail to misrepresent load prices to Plaintiffs. *Id.* Also, Begovic knowingly sent false Statements to Plaintiffs showing incorrect load amounts via mail and email. *Id.* at ¶ 97. Both Kajdic and Begovic intended Plaintiffs to detrimentally rely on the materially false representations, and Plaintiffs did rely on the false representations to their detriment by being underpaid for the work they performed for FR8. *Id.* at ¶ 90-91.

In total, Plaintiffs' Amended Complaint details at least 22 examples of misrepresented load values. *Id.* at ¶¶ 46-67. The exhibits show the dispatch transmissions sent to Plaintiffs, statements of earnings and deductions sent to Plaintiffs, and rate confirmations from third-party brokers to FR8. *Id.* In sum, Plaintiffs received dispatch instructions via app transmissions across state lines showing the date, time and a specific load rate for each load they hauled, in addition to the pickup and drop off locations for the load. *See e.g., Id.* at ¶ 48; Dkt. #24-1 at p. 32 ("rate" of "$3,000"). The app transmissions, however, misrepresented the true load rates. *See e.g.,* Am. Compl. at ¶ 38; Dkt. #24-1 at p. 35 ("[a]greed [r]ate" of "$3,850"). Plaintiffs received fraudulent dispatch instructions

5

at Kajdic's direction. Am. Compl. at ¶ 2. Plaintiffs also received altered statements of earnings and deductions ("Statements") at Kajdic's direction. Am. Compl. at ¶ 2. The Statements sent to Plaintiffs purport to show that Plaintiffs are being paid a "% of Revenue" for the loads they take at FR8's direction. *See e.g., id.* at ¶ 52; Dkt. # 24-2 at p. 8. But the revenue values in the Statements were substantially lower than the true load value shown in the load confirmation emails from third-party brokers. *See e.g.,* Am. Compl. at ¶ 52; Dkt. # 24-2 at p. 10. Begovic knowingly sent false Statements to Plaintiffs showing incorrect load amounts via mail and email. Am. Compl. at ¶ 97. Plaintiffs suffered specific and calculable damages because of Defendants' conduct; Plaintiffs took numerous loads at Defendants' direction but were deprived of the full 88% of the revenue. *See e.g., id.* at ¶¶ 46-70.

**D. Kajdic's Death Threats and Oppressive Conduct Towards Plaintiffs**

Kajdic has engaged in harassment and intimidation to prevent Plaintiffs from revealing the fraud. Dkt. # 22 at ¶ 72. Kajdic texted Plaintiff Bajrektarevic threats of violence about Plaintiff Hujdur, in particular, and about Plaintiffs as a whole. Am. Compl. at ¶¶ 73-78. In the text messages, Kajdic threatened that if Hujdur cost Kajdic business with third-party broker Active On-Demand, then "[h]e will not be alive." *Id.* at ¶ 73; Dkt. # 24-7 at p. 3. Kajdic also made the following threatening statements in text messages, among others: (1) find someone to break every bone in [Hujdur's] body; (2) He tried DOT they laughed at him; (3) leave us the f**k alone or I will f**king personally hit him where it hurts most; (4) too bad he doesn't have

6

kids but he has a wife; (5) if he cost me active … he will not be alive; (6) a hundred thousand in Laredo, someone's head goes off, so let him play with fr8; (7) just warning…tell them to stop pushing…or it won't be good; and (8) someone will end up locked up or…dead.[1] Am. Compl. at ¶¶ 73-76; Dkt. # 24-7 at pp. 2-5. Kajdic made the threatening statements with the intent to influence, delay or prevent Hujdur and Plaintiffs from presenting evidence against him in an official proceeding, such as in court or before the DOT and to dissuade Plaintiffs from reporting Kajdic's behavior to law enforcement. Am. Compl. at ¶ 103. Finally, Kajdic wrongfully terminated Plaintiffs' contracts after they learned of the unlawful behavior to prevent them from gathering evidence corroborating their claims. *Id.* at ¶ 80.

## **LEGAL STANDARDS**

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A court reviewing a motion to dismiss must construe the complaint in the light most favorable to the plaintiff and accept all factual allegations as true. *See Bailey v. Janssen Pharmaceutica, Inc.,* 288 F. App'x 597, 602 (11th Cir. 2008).

---

[1] Because the threatening statements made by Kajdic were sent via short text messages, sometimes in Bosnian, some of the statements are paraphrased or translated. *See* Am. Compl. at ¶¶ 73-76 and Dkt. #24-7 at pp. 2-5.

Moreover, Fed. R. Civ. P. 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "The application of Rule 9(b), however, must not abrogate the concept of notice pleading." *Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (internal quotation marks omitted). The standard is met when a plaintiff alleges what false statements or omissions were made, the time and place and the person responsible, the content of the false statement and how it misled the plaintiff, and what the defendant obtained as a result of the fraud. *See id.*; *Diamond Resorts U.S. Collection Dev., LLC v. Sumday Vacations, LLC*, No. 19-CV-982, 2020 WL 3250130, at *3 (M.D. Fla. Feb. 21, 2020).

## ARGUMENT

### I.    PLAINTIFFS HAVE SUFFICIENTLY ALLEGED THAT DEFENDANTS VIOLATED THE AGREEMENT.

The crux of Defendants' Motion is that all of Plaintiffs' claims rest on a "fundamental misreading" of the Agreement. Motion at p. 2. Since Defendants' Motion frames Plaintiffs' breach of contract claim as a threshold issue, this Response will first address the sufficiency of Count II. As explained below, Defendants' argument is without merit.

To state a claim for a breach of contract, Plaintiffs must allege three elements: (1) the existence of a valid contract; (2) a material breach; and (3) resulting damages. *Sun Life Assur. Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1217 (11th Cir. 2018). The Amended Complaint does so. *See* Am.

8

Compl. at ¶¶ 109-112 (identifying "valid and binding Agreements" for "88% of the linehaul rate for each load" which were breached by Defendants' underpayment and accordingly caused monetary damages). Nonetheless, Defendants contend that there can be no breach or damages because Plaintiffs have misinterpreted the Agreement's requirement for FR8 to pay "eighty-eight (88%) of the line-haul rate ***agreed upon*** *on a truckload basis*[.]" *See* Motion at p. 3 (quoting Dkt.# 24-1 at 12) (emphasis by Defendants). To the extent Defendants urge dismissal based upon the interpretation of a contract, their request should be denied

Defendants' Motion puts forth a competing (and unsupported) interpretation. In their view, the phrase "agreed upon" means the line-haul rate agreed to between FR8 and a truck driver in some subagreement, not the line-haul rate agreed to between FR8 and the third-party broker customer. *See* Motion at p. 4. In other words, Defendants contend that the "linehaul rate" for a given truckload can be different for Plaintiffs than the third-party broker customers, and so result in less compensation.

But, as alleged in the Complaint (and as the Court must accept as true at this stage), paying a truck driver based on a "percentage of the linehaul rate" means paying a driver a percentage of the total price the carrier's third-party broker customers pay the carrier to transport the load. Further, when reading the Agreement as a whole, the linehaul rate clearly means 88% of the gross revenue or load rate. Under the Agreement, Plaintiffs, not Defendants, are responsible for the "gross revenue tax." Dkt. # 24-1 at § 17 and p. 13. Similarly, the Agreement

provides that Plaintiffs are entitled to 88% of any stop charges collected. *Id.* at p. 12. Further, the load confirmation sheets sent to Defendants by third-party brokers show an "[a]greed [r]ate" for each load value – this is the linehaul rate Plaintiffs should be paid. *See* Dkt # 24-1 at p. 35. Industry practice further provides that paying a trucker based on a "percentage of the linehaul rate" means paying a driver a percentage of the total price the carrier's third-party broker customers pay the carrier to transport the load. Am. Compl. at ¶ 40.

Even if Defendant's construction of the Agreement had merit (it doesn't), granting their requested relief—dismissal—would require the Court resolve the parties' competing interpretations. That is inappropriate on a motion to dismiss. *See Hess v. Coca-Cola Refreshments USA, Inc.*, 13-CV-3136, 2014 WL 6909439, at *3 (M.D. Fla. Dec. 9, 2014) (courts "may not engage in contract interpretation at the motion to dismiss stage, as these arguments are more appropriate for summary judgment"); *see also Ben-Yishay v. Mastercraft Dev., LLC*, 553 F. Supp. 2d 1360, 1373 (S.D. Fla. 2008) ("The proper interpretation of [a] provision is not a matter that can be resolved on a motion to dismiss for failure to state a claim"); *Starline Media, Inc. v. Star Status Grp.*, 20-CV-1210, 2020 WL 12813701, at *3 (M.D. Fla. Nov. 17, 2020) (declining to "delineate the exact scope" of the parties' agreement "which is inappropriate on a motion to dismiss"); *Whitney Nat. Bank v. SDC Communities, Inc.*, 09-CV-01788, 2010 WL 1270264, at *2 (M.D. Fla. Apr. 1, 2010) (same).

For a contrary result, Defendants cite out-of-circuit cases holding that dismissal is appropriate when an attached exhibit "incontrovertibly contradicts" a complaint's allegations. *See* Motion at p. 13. But, as explained above, that is not the case here—the Agreement supports Plaintiffs' allegation that 88% percent of the linehaul rate means 88% of the total price the third-party broker customers pay the FR8.

Indeed, at least one federal court has already rejected a strikingly similar argument. In *Piquion v. Amerifreight Sys. LLC,* plaintiff truck drivers sued a defendant motor carrier for, *inter alia*, violations of the TILA when the defendant allegedly underreported load prices and did not pay 88% of the gross revenues for their shipments. No. 22 C 5690, 2023 WL 8113379, at *12 (N.D. Ill. Nov. 22, 2023). Defendant moved to dismiss, arguing that it did not violate the TILA because the lease did not base plaintiffs' payment on a percentage of gross revenue for their shipments. *Id*. at *12. Rather, defendant contended that the payment rate was an individually negotiated rate for each bill of lading. *Id*. In rejecting defendant's argument, the court accepted the plaintiffs' well-pled allegations as true, including the plaintiffs' allegation that defendant purported to pay them 88% of gross revenue. *Id*. The court noted that the settlement sheet attached to plaintiffs' complaint showed a "payment at a rate of 88% of the revenue for each shipment", which "supports the reasonable inference that [defendant] agreed to pay Plaintiffs 88% of the gross revenue from their loads." *Id*. These allegations were sufficient to state a claim under TILA. *Id*. As in *Piquion*, the settlement sheets here state that

Plaintiffs are paid as a "% of revenue" and "$0.88 Percent of Charges." *See e.g.,* Dkt. #24-2 at pp. 4, 8; and Dkt. #24-3, p. 2

Also, if Defendants' proposed contractual interpretation were correct, then they have admitted violating numerous provisions of the TILA. Defendants contend that "[t]he plain meaning and reading of [linehaul rate] means each truckload would be a separate subagreement or contract between Plaintiffs and FR8." Motion at p. 3. Under TILA regulations, however, motor carriers like Defendants "must use a written lease that fulfills certain requirements when transporting goods in equipment that they do not own." *Florexil v. Gen. Freight Experts, Inc.*, 23-60876-CIV, 2023 WL 5831647, at *2 (S.D. Fla. Sept. 8, 2023) (citing 49 C.F.R. § 376.11(a), 376.12). A "Lease" is defined by TILA as "[a] contract or arrangement in which the owner grants the use of equipment, with or without driver, for a specified period to an authorized carrier for use in the regulated transportation of property, in exchange for compensation." 49 C.F.R. § 376.2(e). TILA's regulations require leases to specify numerous items, including but not limited to the compensation arrangement, responsibilities of the parties and deductions. 49 C.F.R. 376.12(d)-(k). Here, the subagreements do not contain these required disclosures.

This is important because Plaintiffs have alleged that Defendants separately breached the Agreement by failing to provide Plaintiffs with the settlement sheets or comply with TILA disclosure standards as required by the lease. With respect to this contractual breach, Defendants make no argument. Nowhere in their Motion do they contest the allegation that Defendants failed to provide Plaintiffs with the

necessary documents to confirm the accuracy of their compensation as required by both the Agreement and TILA. *See* Dkt. # 24-1 at § 6; *see also* 49 C.F.R. § 376.12(g).

Finally, the Complaint alleges Plaintiffs suffered specific, calculable damages because of Defendants' breach. Beyond a conclusory claim that Plaintiffs "suffered no damage," Motion at pp. 13-14, Defendants offer no explanation as to how the Amended Complaint is deficient.

In short, Plaintiffs have sufficiently pled a breach of contract claim. The Court should not interpret the Agreement on a motion to dismiss, but even if it did, the linehaul rate could reasonably be interpreted as meaning gross revenue. Further, even if this Court were to accept Defendants' proposed interpretation, it would still support Plaintiffs' claims under TILA, and consequently, result in a breach of contract because Defendants agreed to comply with TILA and to provide Plaintiffs with settlement sheets – which they did not do. For all these reasons, Defendants' Motion should be denied.

## II.    PLAINTIFFS' AMENDED COMPLAINT PROPERLY AND PLAUSIBLY ALLEGES CIVIL RICO CLAIMS AGAINST DEFENDANTS KAJDIC AND BEGOVIC.

Plaintiffs assert claims against Defendants Kajdic and Begovic arising out of their violations of RICO, 18 U.S.C. § 1962(c). Defendants dedicate a large portion of their Motion arguing that Plaintiffs do not plausibly plead a RICO conspiracy claim. Motion at pp. 8-11. The Court can easily dispose of these arguments because they are irrelevant. Plaintiffs have not alleged a RICO conspiracy claim.

13

Rather, Plaintiffs state a claim pursuant to 18 U.S.C. § 1962(c), alleging Kajdic and Begovic participated, directly and indirectly, in an unlawful scheme to defraud and/or intimidate Plaintiffs. 18 U.S.C. § 1962(c). In contrast to subsection (c), RICO conspiracy claims are governed by 18 U.S.C. § 1962(d), and are not at issue in this case. Defendants' conspiracy argument is thus misplaced and irrelevant.

Defendants' characterization of Plaintiffs' RICO claim as nothing more than a "garden variety breach of contract claim" ignores the well-pled facts and is similarly misplaced.  Motion at p. 2. Defendants repeatedly rely on and cite to *dicta* from out-of-circuit cases. *See id.* at 6. Plaintiffs are unaware of any case where a court has found that it is a "garden variety breach of contract claim", when a defendant, such as A. Kajdic, threatens to break every bone in a plaintiff's body and kill a plaintiff. *See* Dkt. # 24-7 at pp. 2-4. Regardless, "[Defendants] ha[ve] pointed to no federal case or statute prohibiting a plaintiff from bringing a RICO action where a breach of contract claim also exists. In fact, many RICO cases involve contract disputes." *Arabian American Oil Co. v. Scarfone*, 939 F.2d 1472 (11th Cir. 1991) (citation omitted); *see also Gemstone Foods, LLC v. AAA Foods Enters.*, No. 5:15-cv-02207-MHH, 2022 WL 439538, *5-6 (N.D. Ala. Feb. 12, 2022). (permitting RICO claim to proceed even where a breach of contract claim could also exist); *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1278 (S.D. Fla. 2003) ("[C]ontractual settings can provide the context for RICO mail fraud claims if there is a pattern of misrepresentations amounting to both a scheme to defraud and racketeering activity.") (citations omitted). The "[c]oncealment of critical data, even

14

without a formalized duty to disclose, may also constitute mail and/or wire fraud in certain situations." *Id.*

Here, Defendants' conduct amounts to far more than a mere failure to fulfil contractual obligations. Kajdic – with no intention of paying Plaintiffs the full linehaul rate – fraudulently induced Plaintiffs into executing the Agreement by falsely representing to Plaintiffs that FR8 would pay Plaintiffs 88% of each load they hauled. Am. Compl. at ¶¶ 35, 37. After Plaintiffs signed the Agreement, Kajdic deceived Plaintiffs by directing FR8's employees to provide Plaintiffs with dispatch instructions containing incorrect load prices. *Id.* at ¶ 90. Kajdic also directed others to conceal load price amounts in transactions so that Plaintiffs had no way of knowing that they were being defrauded. *Id.* at ¶¶ 45, 97, 107. Further, at Kajdic's direction, FR8's employees and/or agents used interstate wires and mail to misrepresent the load prices to Plaintiffs. *Id.* at ¶ 90. Also, Kajdic made death threats about Plaintiff Hujdur to discourage him from participating in official proceedings. *See id.* at ¶¶ 72-78, 101-106; *see also* Dkt. # 24-7 at pp. 2-5. Defendants do not argue that Plaintiffs' allegations fail to meet the elements of witness and/or victim tampering; instead, Defendants complain that some of the text messages are translated using Google translate. Defendants, however, do not propose any alternative, innocuous translations of Kajdic's statements. And setting the Bosnian texts aside, Kajdic's English messages suffice to state a claim. Kajdic explicitly states that if Hujdur "costs [Kajdic] active, [then] he will not be alive." Dkt. # 24-7 at p. 3. Kajdic's threats constitute a "threat involving murder…which is

15

chargeable under State law and punishable by imprisonment for more than one year[.]" 18. U.S.C. § 1961(1)(A). Further, because the statements were made to discourage Plaintiffs from participating in official proceedings, Kajdic's statements amount to victim and witness tampering within the meaning of 18 U.S.C. § 1512 and 18 U.S.C. § 1513. Defendants have pointed to no authority, nor have they raised any substantive argument stating otherwise.

Defendants also disingenuously argue that Plaintiffs "barely make reference to A. Begovic", Motion at p. 10, even though Plaintiffs' Amended Complaint provides ample details of Begovic's participation in the fraudulent scheme; namely, Begovic was in charge of sending out Statements to Plaintiffs, in addition to running the financial operations of FR8. Am. Compl. at ¶¶ 91, 141. Begovic participated in the fraud by knowingly sending false Statements to Plaintiffs showing incorrect load amounts via mail and email. *Id.* at ¶ 97.

Defendants further argue that Plaintiffs do not allege the fraud with sufficient particularity. Not so. Each dispatch instruction provides the date and time that each misrepresentation occurred, in addition to the underreported load price, *see e.g.,* Dkt. # 24-1 at pp. 224-26. The dispatch instructions were sent by dispatchers at Kajdic's direction. Am. Compl. at ¶¶ 36, 97. Similarly, each Statement is dated and contains the false load price. *See e.g.*, Dkt. #24-4 at p. 6. Begovic sent the Statements at Kajdic's direction. Am. Compl. at ¶ 97. Accordingly, Defendants' Motion should be denied. *See Maale v. Kirchgessner*, 08-80131-CIV, 2008 WL 11333757, at *4 (S.D. Fla. Dec. 31, 2008) (denying defendants' motion to dismiss

16

plaintiff's RICO claim when plaintiff alleged defendants fraudulently induced him to execute a contract and when defendants deliberately misrepresented material facts via telephone, email and U.S. mail).

### III.   DEFENDANTS WAIVED ANY ARGUMENT ON PLAINTIFFS' TILA AND FDUTPA CLAIMS.

This Court should not entertain Defendants' request to dismiss Counts III and IV of Plaintiffs' Amended Complaint because Defendants have preserved no argument with respect to those counts. Defendants make only passing references to Plaintiffs' TILA and FDUTPA claims, without citation to any authority. Defendants' perfunctory and underdeveloped arguments are waived. *See e.g., U.S. Steel Corp. v. Astrue*, 495 F. 3d 1272, 1287 n. 13 (11th Cir. 2007). "In other words, under the adversary system, the Court does not serve as Defendant's law clerk and will not fill in the gaps for Defendant." *Quicken Loans Inc. v. Mason Dixon Contracting, Inc.*, 5:20-CV-89, 2020 WL 13379383, at *3 (M.D. Fla. Aug. 19, 2020) (cleaned up). Accordingly, Counts III and IV of Plaintiffs Amended Complaint should stand.

### IV.   PLAINTIFFS HAVE SUFFICIENTLY PLED CLAIMS UNDER TILA.

As discussed above, Defendants violated the TILA and have waived any argument on the issue since they did not address it in their brief. In any event, Defendants' TILA violations have been well-pled. Under the TILA, carriers are required to provide lessors copies of freight bills or other forms of freight documentation, when the lessor's revenue is based on a percentage of the gross revenue for a shipment. 49 C.F.R. § 376.12(g). Regardless of the compensation

method, the lease must permit the lessor to examine copies of documents from which rates and charges are computed. *Id.* Here, Defendants did not provide Plaintiffs with any documentation to substantiate the legitimacy of the rates Defendants paid Plaintiffs. Am. Compl. at ¶ 138. Instead, Defendants falsely represented the load prices to Plaintiffs and deprived Plaintiffs of the opportunity to examine the documentation needed to confirm the rates for each load. *Id.* at ¶¶ 45, 137-142. Defendants are silent on this point. Defendants' Motion should be denied.

## V.      PLAINTIFFS HAVE STATED A CLAIM UNDER FDUTPA.

Even though Defendants have waived any argument in support of dismissal, Plaintiffs have nonetheless stated a claim under FDUTPA. A claim under FDUTPA has three elements: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Commodores Entm't Corp. v. McClary*, 324 F. Supp. 3d 1245, 1254 (M.D. Fla. 2018), *aff'd,* 822 Fed. Appx. 904 (11th Cir. 2020). Plaintiffs have adequately alleged all three.

Satisfying the first element, Plaintiffs allege that Defendants defrauded Plaintiffs by devising and participating in a scheme to pay Plaintiffs less than their contractually agreed upon pay. *See, e.g.,* Dkt. 22 at ¶¶ 1, 2, 36, 44-45, 71. Under the terms of the Agreement, Defendants agreed to pay Plaintiffs 88% of each load they hauled. *See* Dkt. 22 at ¶¶ 2, 35, 39. However, Defendants ultimately paid Plaintiffs significantly less than 88% of each load. *Id.* at ¶ 41. In furtherance of the scheme to underpay Plaintiffs, Defendants concealed and failed to fully disclose to

18

Plaintiffs the true load price amounts in transactions with third-party brokers. *Id.* at ¶ 118. Defendants perpetrated the underpayment by falsifying dispatch instructions and statements given to Plaintiffs to reflect a load rate substantially lower than the real value. *Id.* at ¶ 118. Also, Defendants harassed and intimidated Plaintiffs to prevent them from uncovering and reporting this misconduct, including by sending threatening text messages and terminating Plaintiffs' contracts when they inquired about the falsified dispatch instructions and statements. *See* Dkt. 22 at ¶¶ 72-78, 80. These allegations go beyond alleging a mere breach of the Agreement, they allege deceptive and unfair behavior prohibited under FDUTPA.

As for the remaining two elements of the claim, those too are well-pled. Plaintiffs allege that they suffered actual damages as a result of Defendants' conduct when they were underpaid for the work they performed in transporting loads through interstate commerce. *Id.* at ¶¶ 121-123. As such, dismissal of Plaintiffs' FDUTPA claim is not warranted.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss and grant Plaintiffs any further relief this Court deems just.

Respectfully submitted,

*/s/ Stephanie A. Casey*
Stephanie A. Casey
Florida Bar No. 97483
scasey@colson.com

19

Thomas A. Kroeger
Florida Bar No. 19303
tom@colson.com
Sabrina S. Saieh
Florida Bar No. 125290
sabrina@colson.com
**COLSON HICKS EIDSON, P.A.**
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Phone: (305) 476-7400

Rain Montero
*Pro hac vice*
IL Attorney No. 6339412
**JAFFE & BERLIN, L.LC.**
111 W. Washington, Suite 900
Chicago, IL 60602
(312) 372-1550
rmontero@jaffeberlin.com

*Counsel for Plaintiffs and the Putative Class*

20

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 1, 2024, I filed a true and correct copy of the foregoing document with the Clerk of Court using the CM/ECF system. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

/s/ Stephanie A. Casey
Stephanie A. Casey